# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00060-CV

**Nadeau Painting Specialist, Ltd., Appellant**

**v.**

**Dalcor Property Management, Inc., Appellee**

### FROM THE COUNTY COURT AT LAW NO. 1 OF TRAVIS COUNTY
### NO. 286455, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal presents evidentiary and procedural issues controlling whether an apartment management company is liable to pay a painting company for services that management company had obtained on behalf of the apartment's owners. Finding no error, we will affirm the trial court's judgment that the painting company take nothing on its claims.

## BACKGROUND

This case was tried to the court, which heard the following pertinent evidence. Appellee Dalcor Property Management, Inc., is in the business of managing apartment communities for various owners and lenders in the Austin and Houston areas. At relevant times, Dalcor managed four apartment properties in the Austin area that were each owned by a different limited partnership. Three of the properties are important to this case: Greystone Park Apartments, owned by DA Residential No. One, Ltd.; The Pointe at Woodhollow Apartments, owned by DA Residential

No. Two, Ltd.; and Indian Creek Apartments, owned by DA Residential No. Three, Ltd. The fourth apartment property, owned by a fourth limited partnership, was known as Aubrey Hills Apartments. Jigar Parikh, a Dalcor employee who handled his company's accounts payable, testified that he telephoned appellant Nadeau Painting Specialists, Ltd., regarding hiring Nadeau to perform work at the four Austin properties it managed. Parikh spoke to Dennis Nadeau, Nadeau's owner and president.

According to Parikh, he told Mr. Nadeau that Dalcor "managed four properties in the Austin area. And that we were looking for a painter to provide services for those properties." Parikh further testified that he explained "we have four properties in Austin, three of them were in one partnership and the fourth was in a different partnership from the other three." While bills were being paid timely by one of the partnerships, Parikh explained, "the other three properties, which were owned by different partnerships, they were struggling and trying to get the invoices paid on those properties right away. And we would try to get them paid as soon as possible." Parikh stated that Mr. Nadeau "understood . . . the difference in those three properties versus the one." Mr. Nadeau also testified at trial. When asked whether he was aware during this conversation that Dalcor managed, but did not own, each of the four properties, he responded, "Not necessarily. I did not know that they were just a management company."

Mr. Nadeau and Randy Plitt, as "DALCOR representative," subsequently executed an agreement titled, "Austin Painting Contract." It provided:

> This contract is between DALCOR Property Management and Nadeau Painting Specialists, Ltd., as agreed by Dennis Nadeau and Randy Plitt, owner's representative. This contract is exclusive for DALCOR properties that are listed below. If any price changes are made, a 30-day written notification is required before prices will go into effect. Either party may cancel this contract with a 30-day written notice.

2

The document then listed the four properties—"Aubrey Hills," "Indian Creek," "Greystone Park," and "Pointe @ Woodhollow"—and stated per-unit prices, effective June 15, 2004, for specified painting work.[1] The agreement further stated that "[t]hese prices will also be in effect for any future complexes we acquire in the Austin area." The agreement also required Nadeau to obtain prior approval from Dalcor for "any sheetrock repairs, kilz,[2] color changes, wallpaper removal or texturing, ceiling paint, occupied paint, or anything else other than regular paint" by submitting a written bid or proposal, which Dalcor would approve by a purchase order.[3] It further provided that "[i]nvoices that charge prices higher than this contract or specific purchase order will not be paid if you failed to get prior approval on the higher price."

Nadeau performed work at each of the three properties. In evidence were a series of Nadeau invoices charging for work it performed at each property. The earliest of these were for services at Greystone Park and Pointe at Woodhollow, each dated August 27, 2004; the earliest invoice for services provided at Indian Creek Apartments was dated September 3, 2004. Nadeau addressed each of the invoices not to Dalcor but to the name of the apartment property where it performed the work—"Indian Creek," "Greystone Park," or "The Pointe @ Wood Hollow"—at the street address for each property. The evidence indicates that Nadeau sent an invoice to each property on roughly a weekly or biweekly basis through April 8, 2005.

_____

[1] The prices were $95.00 for "full paint-across the board (properties provide the paint)"; "$60.00 for 'touch up' paint"; and "45.00 extra for color change"; and specified that "[t]hese prices include sweeping ceiling and baseboards, fixing minor repairs (nail holes and minor cracks throughout unit), and kilz ink and/or water stains."

[2] Kilz is apparently a type of primer or surface preparation.

[3] If Nadeau noticed any discrepancies between its proposal and the amount approved, it was to contact Parikh "before performing any services."

Mr. Nadeau testified that while he received payment from Aubrey Hills, obtaining payment from the other three properties "became a problem right away from the start." In evidence were checks written to Nadeau from each of the apartment properties. Each of the checks were styled "DALCOR Property Management, Inc., Agent for [as applicable, "Indian Creek Apartments," "Greystone Park Apartments," or "Pointe @ Woodhollow Apts"]." Below this name was listed Dalcor's address.[4] The earliest of the checks from each complex were each dated October 21, 2004. Several of the checks paid invoices as late as six months after Nadeau billed them.[5]

In late April or early May 2005, according to Parikh, the partnerships that owned Indian Creek, Greystone Park, and Pointe at Woodhollow deeded the properties to their lender in lieu of foreclosure. The lender hired a new property management company, which notified Nadeau that its contract was void as of May 3, that the new owners would not pay any debts incurred prior to that date, and that it should contact Dalcor for payment of any outstanding invoices.

Nadeau sued Dalcor on a sworn account, claiming that Dalcor owed it a principal balance due of $21,754.74 for Nadeau's painting services. *See* Tex. R. Civ. P. 185. Nadeau attached records purporting to show unpaid invoices on each of the three properties. The earliest unpaid invoice for which Nadeau claimed recovery was October 22, 2004, for Indian Creek Apartments; November 5, 2004, for Greystone Park; and October 14, 2004, for Pointe at Woodhollow. Nadeau

---

[4] This information appeared in the upper left-hand corner of each check, in the following format:

DALCOR Property Management, Inc.
Agent for Indian Creek Apartments
5055 W. Park Blvd., Suite 700
Plano, Texas 75093

[5] In February 2005, for example, checks from each property were issued to pay invoices dating back to August and September 2004, and checks were issued in March to pay October invoices.

also sought attorney's fees. Dalcor answered with a general denial. The case proceeded to a bench trial on those pleadings.

When the case was called, Dalcor's counsel announced not ready and moved for a continuance on the basis that Nadeau had sued the wrong party—he argued that Dalcor had acted solely in the capacity of an agent for the three limited partnerships that had owned the apartments and was not liable to Nadeau. Counsel for Nadeau responded that Dalcor had not filed a sworn denial disputing its liability in the capacity in which it was sued. He then stated, "the issue is not before the Court and if the Court deems otherwise, we're prepared to go forward with the named defendant as the correct defendant and the one that we had the contractual relationship with." Dalcor replied that "I'm begging for mercy for the opportunity to put on and have the case—we're prepared to go on the merits. And if permitted the opportunity to present the evidence that we have concerning the ownership of the entities and the facts surrounding, you know, the dealings between the parties, then we're not liable. We're prepared to go ahead." The trial court then inquired, "You're prepared to go ahead today?" Dalcor's counsel responded, "With that proviso, yes." The trial court replied, "Well, let's go forward then," and denied Dalcor's motion for continuance.

Nadeau proceeded to call Mr. Nadeau to testify. The "Austin Painting Contract" was introduced, as were the invoices reflecting the amounts Nadeau claimed it was owed. During cross-examination, counsel for Dalcor inquired about Mr. Nadeau's initial conversation with Parikh and his awareness that Dalcor managed, but did not own, the properties. Counsel for Nadeau objected that evidence going to Dalcor's agency capacity was not supported by the pleadings and, therefore, irrelevant. Dalcor's counsel responded that Nadeau had "opened the door" by introducing the invoices, which "do not mention Dalcor [and] only mention the names of the property." The trial court overruled Nadeau's objection. Over Nadeau's further objection, Dalcor was permitted to

5

present evidence relevant to Mr. Nadeau's awareness that he was contracting with Dalcor in a representative capacity and on behalf of the three limited partnerships that owned the apartments, including the checks described above. Dalcor then sought leave to file a trial amendment raising its capacity defense, which the trial court granted. During its case-in-chief, Dalcor presented Parikh's testimony, additional evidence regarding the relationship between Dalcor and the three limited partnerships, and evidence regarding the legal identity of the partnerships and the foreclosure of the properties.[6]

At the conclusion of trial, the trial court announced that, subject to Dalcor's filing its trial amendment, it would rule that Dalcor had executed the contract in a representative capacity and was not liable. It later rendered judgment that Nadeau take nothing on its claims against Dalcor. The trial court subsequently made findings of fact and conclusions of law. The fact findings included:

- "DA Residential No. One, Ltd. owned and operated an apartment property . . . doing business under the assumed name of Greystone Park"; "DA Residential No. Two, Ltd. owned and operated an apartment property . . . doing business under the assumed name of Pointe @ Woodhollow"; and "DA Residential No. Three, Ltd. owned and operated an apartment property . . . doing business under the assumed name of Indian Creek."

- Dalcor was the agent and property manager for each of the limited partnerships with respect to the apartments it owned.

- Dalcor had the actual authority to contract for services at the properties on behalf of the limited partnerships.

- "Dalcor disclosed to Nadeau Painting that each of the four principals would be responsible for payment for any painting services provided by Nadeau."

---

[6] To dispel the possibility that any preferential payments were made to Dalcor, Parikh testified that the three partnerships had owed it approximately $787,000.

- Parikh "testified that he informed Nadeau Painting prior to contract formation that three of the identified Principals were in financial difficulty and that these three Principals may not be able to make timely payments."

- "The charges for Nadeau's painting services are the obligation of Dalcor's principals, and not debts for which Dalcor is responsible to Nadeau."

Based on these fact findings, the trial court concluded:

- "Dalcor is not liable to Nadeau for any painting services performed at any of the properties owned by any of Dalcor's principals because Dalcor ordered painting services from Nadeau in Dalcor's capacity as a disclosed agent for Dalcor's adequately identified principals."

- "Before any contract was formed or services were provided by Nadeau to any of Dalcor's four principals, Nadeau had actual knowledge, or should have known: (a) that Dalcor was, in fact, acting as the agent for each of Dalcor's four principals; (b) that Dalcor's true legal status in the matter was as agent for each of its four principals; and (c) of the identity of the four principals for whom Dalcor was acting as agent."

- Nadeau shall take nothing on its claims against Dalcor.

Nadeau filed a motion for reconsideration and for new trial in which it briefed the legal issue of whether Dalcor's disclosure of its agency status had been adequate to avoid liability. It also urged the trial court to reconsider its ruling on the trial amendment, adding a complaint that Dalcor had failed to respond to Nadeau's requests for disclosures, in which it had been required to disclose its capacity theory. *See* Tex. R. Civ. P. 194.2(b), (c). The trial court denied the motion by written order. Nadeau appeals.

**ANALYSIS**

Nadeau brings two issues on appeal. In its first issue, Nadeau challenges the legal and factual sufficiency of the evidence supporting the trial court's fact findings underlying its legal conclusion that Dalcor was not liable. In its second issue, Nadeau contends that the trial court abused its discretion in granting Dalcor leave to file a trial amendment raising its capacity defense.

7

Alternatively, Nadeau urges that "the court should have considered Nadeau's complaints, post trial but pre-judgment, that Dalcor failed to respond to multiple requests for disclosure which would have given Nadeau notice of Dalcor's defense."

**Trial amendment**

We turn first to Nadeau's issue regarding the trial amendment. Rule 66 of the rules of civil procedure governs trial amendments:

> If evidence is objected to at the trial on the ground that it is not within the issues made by the pleading, or if during the trial any defect, fault or omission in a pleading, either of form or substance, is called to the attention of the court, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the allowance of such amendment would prejudice him in maintaining his action or defense upon the merits. The court may grant a postponement to enable the objecting party to meet such evidence.

Tex. R. Civ. P. 66. A trial court may not refuse a trial amendment unless (1) the opposing party presents evidence of surprise or prejudice, or (2) the amendment asserts a new cause of action or defense, and thus is prejudicial on its face, and the opposing party objects to it. *State Bar v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex. 1994); *see Greenhalgh v. Service Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex. 1990); *Perez v. Embree Constr. Group, Inc.*, 228 S.W.3d 875, 883 (Tex. App.—Austin 2007, pet. denied). In these two situations, the decision to allow or deny the amendment rests with the sound discretion of the trial court, and the trial court's decision will not be overturned unless it constitutes a clear abuse of discretion. *Kilpatrick*, 874 S.W.2d at 658; *G.R.A.V.I.T.Y. Enters. v. Reece Supply Co.*, 177 S.W.3d 537, 542 (Tex. App.—Dallas 2005, no pet.). A court abuses its discretion when it makes a decision without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d

238, 241-42 (Tex. 1985); *Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 570 (Tex. App.—Austin 2003, no pet.).

When the granting of a trial amendment would prejudice a party in maintaining its cause of action or defense, the amendment should be denied or, alternatively, a motion for continuance should be granted to enable the objecting party to respond. *Celotex Corp. v. Gracy Meadow Owners Ass'n*, 847 S.W.2d 384, 388 (Tex. App.—Austin 1993, writ denied). Here, Nadeau not only failed to seek a continuance at any time to respond to Dalcor's capacity defense, but opposed granting Dalcor's request for a continuance in order to amend its answer to assert that defense. With reference to Dalcor's capacity defense, Nadeau maintained that "the issue is not before the Court," but then expressed what the trial court could have understood to be Nadeau's acquiescence in litigating the issue if the court concluded differently—"... and *if the Court deems otherwise*, we're prepared to go forward with the named defendant as the correct defendant and the one that we had the contractual relationship with." In response, Dalcor advised that it intended to present evidence supporting its capacity defense "if permitted the opportunity." Thus, Nadeau proceeded to trial knowing that Dalcor would be attempting to defend itself on the ground that it was not liable in the capacity in which it was sued. On this record, we cannot conclude that the trial court abused its discretion in permitting the trial amendment.

We acknowledge Nadeau's complaint that Dalcor should have disclosed its defensive theory that Nadeau had sued the wrong party in its responses to requests for disclosures. *See* Tex. R. Civ. P. 194.2(b), (c). Dalcor concedes that it did not respond to these requests. However, we must agree with Dalcor that Nadeau failed to preserve its complaint regarding the rule 194 disclosures. *See* Tex. R. App. P. 33.1.

We overrule Nadeau's second issue.

9

**Dalcor's liability**

In its first issue, Nadeau challenges the legal and factual sufficiency of the evidence supporting the trial court's findings of facts on which it based its legal conclusion that Dalcor was not liable on Nadeau's claims. The trial court's findings of fact in a bench trial have the same force and dignity as a jury's verdict upon jury questions, *Florey v. Estate of McConnell*, 212 S.W.3d 439, 444-45 (Tex. App.—Austin 2006, pet. filed) (citing *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991)), and are similarly reviewed for legal and factual sufficiency of the evidence. *Id*. at 445 (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)); *see also BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

When reviewing the evidence for legal sufficiency, we consider the evidence in the light most favorable to the challenged finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). Evidence is legally insufficient if the record reveals: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *Id*. at 810. Evidence is legally sufficient if it would enable fair-minded people to reach the verdict under review. *Id*. at 827.

When reviewing the evidence for factual sufficiency, we must weigh all the evidence in the record and overturn the findings only if they are so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). We may not pass upon the witnesses' credibility or substitute our judgment for that of the trier of

fact, even if the evidence would support a different result. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

We review the trial court's legal conclusions de novo. *BMC Software*, 83 S.W.3d at 794. The court's conclusions will be upheld unless they are erroneous as a matter of law. *Florey*, 212 S.W.3d at 445. Incorrect conclusions will not require reversal if controlling findings of fact will support a correct legal theory. *Id.*

The context of Nadeau's evidentiary-sufficiency challenges is a set of familiar concepts of principal-agency law. "Unless the parties have agreed otherwise, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract." *A to Z Rental Ctr. v. Burris*, 714 S.W.2d 433, 435 (Tex. App.—Austin 1986, writ ref'd n.r.e.); *see also Burch v. D. L. Hancock*, 56 S.W.3d 257, 261 (Tex. App.—Tyler 2001, no pet.); Restatement (Second) of Agency § 320 (1957). "If, however, the principal remains undisclosed, or if it is known that a person is acting as an agent but the principal's identity is not disclosed, the agent is a party to the contract." *Burris*, 714 S.W.2d at 435; *see* Restatement (Second) of Agency §§ 321, 322 (1957); *Boyles v. McClure*, 243 S.W. 1080, 1081-82 (Tex. Comm. App. 1922, judgm't adopted); *see also* 12 Williston on Contracts § 35:43 (4th ed. 1999).

Consequently, "[i]f an agent would avoid personal liability, he has the duty to disclose not only that [1] he is acting in a representative capacity but also [2] the identity of his principal." *Burris*, 714 S.W.2d at 435. "[T]he party with whom the agent deals has no duty to discover the principal." *Id.* "The inference that the agent is a party to the contract exists until the agent gives such complete information concerning the principal's identity that the principal can be readily distinguished; if the other party has no reasonable means of ascertaining the principal, the inference

11

prevails unless the parties have agreed otherwise." *Id*.; *see also* Restatement (Second) of Agency § 321 cmt. a (1957). Uncommunicated intent will not suffice. *Seale v. Nichols*, 505 S.W.2d 251, 255 (Tex. 1974). "The test for disclosure is the other party's knowledge, or reasonable grounds to know, of the principal's existence or identity, irrespective of the source from which the other party obtains it." *Burris*, 714 S.W.2d at 435 (citing *Johnson v. Armstrong*, 18 S.W. 594, 595 (Tex. 1892) & *Carter v. Walton*, 469 S.W.2d 462, 471 (Tex. Civ. App.—Corpus Christi 1971, writ ref'd n.r.e.)). "The other party's actual knowledge of the principal, not just the other party's suspicion, is the test." Id.

The issue of disclosure is a question of fact. *Lacquement v. Handy*, 876 S.W.2d 932, 939 (Tex. App.—Fort Worth 1994, no writ). Where conflicting evidence is presented concerning disclosure, the issue must be resolved by the trier of fact. *Id*. In determining whether sufficient disclosure was made, we look to the time that the parties entered into the contract. *Posey v. Broughton Farm Co.*, 997 S.W.2d 829, 832 (Tex. App.—Eastland 1999, pet. denied); *Lacquement*, 876 S.W.2d at 940. Knowledge acquired after a cause of action has accrued cannot affect the right to recover from the agent personally on a contract. *See Dodson v. Peck*, 75 S.W.2d 461, 463 (Tex. Civ. App.—Amarillo 1934, writ dism'd w.o.j.).

Nadeau concedes that there is sufficient evidence to support the trial court's findings that, at relevant times, Dalcor had disclosed to Nadeau that it was acting in a representative capacity. However, Nadeau maintains that there is insufficient evidence of the second element of the disclosure requirement—that Dalcor adequately disclosed the "identity of its principal." *See Burris*, 714 S.W.2d at 435. We conclude that there is legally and factually sufficient evidence that Dalcor

12

had disclosed to Nadeau that it was acting as the agent of three limited partnerships that owned Indian Creek, Greystone Park, and Pointe at Woodhollow. This evidence includes:

- Parikh's testimony that he told Mr. Nadeau that Dalcor managed the four apartment properties, that the properties were each owned by a different limited partnership, that three of the limited partnerships "were struggling and trying to get the invoices paid on those properties," and that Mr. Nadeau understood "the difference in those three properties versus the one."

- The "Austin Painting Contract," which, while not a model of clarity regarding the capacity in which Dalcor was signing it, did refer to Dalcor's Randy Plitt as "owner's representative."

- Nadeau invoices for work it performed at each apartment property, which were addressed to each apartment property by its name and address, and do not refer to Dalcor. The record contains invoices from August 2004 for Greystone and Pointe at Woodhollow, and September 2004 for Indian Creek. Those invoices predate the earliest services at each property for which Nadeau seeks recovery in its suit. In other words, by the time the obligations made the basis for Nadeau's suit arose, Nadeau already knew to bill the properties in this manner.

- Similarly, the record contains copies of checks through which Nadeau was paid on some of its invoices. The checks clearly identify the payor as "DALCOR Property Management, Inc., Agent for Indian Creek Apartments," ". . . Greystone Park Apartments," or ". . . Pointe @ Woodhollow Apts." The checks for Indian Creek and Greystone predate the earliest services at those properties for which Nadeau is seeking recovery, and are further evidence that Nadeau knew Dalcor was the "Agent for" the apartments' owners before the obligations made the basis for its suit arose. As for Pointe at Woodhollow, only a single unpaid invoice, for $95, predates the first check.

Nadeau does not seem to dispute that sufficient evidence exists of its knowledge that Dalcor was representing the limited partnerships that owned the apartments. Instead, Nadeau focuses solely on the narrow contention that Dalcor never disclosed the *legal names* of the limited partnerships—i.e., DA Residential No. One, Ltd., the owner of Greystone Park; DA Residential No. Two, Ltd., the owner of Pointe at Woodhollow; and DA Residential No. Three, Ltd., the owner of Indian Creek. Nadeau is correct—there is no evidence that Dalcor disclosed at any relevant time

13

the precise legal names of the limited partnerships that it represented. Dalcor does not appear to contend otherwise.[7]

Nadeau relies on a number of court of appeals' decisions that, in a variety of factual contexts, have suggested that disclosure only of a principal's "trade name" or assumed name may be insufficient to relieve an agent of liability. *See Burch*, 56 S.W.3d at 263; *Posey v. Broughton Farm Co.*, 997 S.W.2d 829, 832 (Tex. App.—Eastland 1999, pet. denied); *Lacquement*, 876 S.W.2d at 939-40; *Burris*, 714 S.W.2d at 437; *Carter v. Walton*, 469 S.W.2d 462, 470-71 (Tex. Civ. App.—Corpus Christi 1971, writ ref'd n.r.e.); *Lachmann*, 375 S.W.2d at 785. Dalcor responds that while trade or assumed names may *sometimes* constitute inadequate disclosure of agency under the circumstances, its disclosures here were adequate under the circumstances. Dalcor relies on *Johnson v. Armstrong*, 18 S.W. 594 (Tex. 1892), in which the Texas Supreme Court held that circumstances may exist that are sufficient to put plaintiffs "upon inquiry" that they are contracting with a principal, or from which the plaintiffs' actual knowledge of that fact may be inferred, despite the agent's not having explicitly disclosed the principal's legal identity. *See id*. at 594-95.[8] Dalcor also argues that there is sufficient evidence from which the trial court could have

[7] Dalcor did present evidence at trial that it would have been possible for Nadeau to easily ascertain the legal identity of its principals: Nadeau's real estate counsel, before writing an April 28, 2005 demand letter, was able to ascertain the true legal names of the limited partnerships merely by consulting Travis County Appraisal District Records for the properties. However, Dalcor presented no evidence that Nadeau actually had learned the legal identity of Dalcor's principals before Dalcor incurred the obligations made the basis for Nadeau's claims.

[8] In *Johnson*, the president of a college hired architects to design buildings for the college, which was an incorporated entity. *Johnson v. Armstrong*, 18 S.W. 594, 594-95 (Tex. 1892). The architects sought to hold the president, rather than the college, liable for payment. *Id*. at 595. The supreme court acknowledged that "[t]he evidence does not in so many words show that they [the architects] knew that the building was to be constructed by an existing corporation so as to

14

inferred that Nadeau and Dalcor had agreed that Nadeau would look only to the limited partnerships that owned the apartments (whatever the partnerships' precise names might have been) for payment. In addition to its fact findings regarding disclosure of Dalcor's agency status and its principal, the trial court found that "Dalcor disclosed to Nadeau Painting that each of its four principals would be responsible for payment for any painting services provided by Nadeau," and added that Parikh "testified that he informed Nadeau Painting prior to contract formation that three of the identified Principals were in financial difficulty and that these three Principals may not be able to make timely payments."

We agree, based on the evidence we have already summarized, that there is legally and factually sufficient evidence that Nadeau had agreed to look solely to the limited partnerships for payment. This evidence, and the trial court's fact findings based on that evidence, support the trial court's judgment. As the Court observed in *Burris*, the inference that the agent is a party to the

---

apprise them that Johnson had a principal capable of being bound by the contract." *Id*. Nonetheless, the court reasoned that the evidence:

> does show that there was in fact such a corporation and principal, and the circumstances that were known to the plaintiffs were sufficient to put them upon inquiry. The inquiry that it was their duty to make, under the circumstances of the case, would have developed a responsible principal, and it is difficult to conclude that the plaintiffs did not have actual knowledge that they were dealing with a corporation, notwithstanding the fact that they did not at the time of making the contract inquire for or get that information from Johnson, the agent.

*Id*. The supreme court further reasoned that the plaintiffs knew that the buildings were intended for a public and not for a private purpose and, consequently, also should have known that the buildings were for the college and not for the president who hired them. *Id*.; *see also American Appraisal Co. v. Constantin*, 98 S.W.2d 1003 (Tex. Civ. App.—Fort Worth 1936, no writ); *Veazie v. Beach Plumbing & Heating Co.*, 235 S.W. 695, 697-98 (Tex. Civ. App.—Fort Worth 1921, no writ).

15

contract exists either "until the agent gives such complete information concerning the principal's identity that the principal can be readily distinguished" or "*unless the parties have agreed otherwise*." *Burris*, 714 S.W.2d at 435 (emphasis added); *see* Restatement (Second) of Agency § 321 ("*Unless otherwise agreed*, a person purporting to make a contract with another for a partially disclosed principal is a party to the contract.") (emphasis added). Consequently, we need not reach any potential implications of the *Lachmann* line of cases or whether Dalcor's disclosures regarding the limited partnerships were alone adequate to defeat the inference that it would be liable.[9] We overrule Nadeau's first issue.

## CONCLUSION

Having overruled Nadeau's issues, we affirm the judgment of the trial court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Patterson and Pemberton;
  Concurring Opinion by Justice Patterson

Affirmed

Filed:  July 18, 2008

_____

[9] We observe that, to the extent the *Lachmann* line of cases stand for a categorical rule that an agent's disclosure of a principal's assumed or trade name is inadequate to avoid liability, as Nadeau urges, the decisions have been criticized as relying on an erroneous view of *Lachmann* and as being out-of-step with modern commercial realities. *See* Elizabeth S. Miller, *Agents Take Heed: A Principal By Any Other Name Is Not A Disclosed Principal – The Perils of Identifying a Principal By Its Trade Name*, 13 Corp. Couns. Rev. 281, 284-302 (1994).